## PLEWS v. BURRAGE.

(Circuit Court of Appeals, First Circuit. July 26, 1921.)

No. 1510.

1. **Action ⬅═23—Plaintiff may plead equitable reply to legal defense.**

Under Act March 3, 1915 (Judicial Code, § 274b [Comp. St. § 1251b]), providing that in actions at law equitable defenses may be interposed by answer, plea, or replication, without filing a bill in equity, where a legal defense is set up in the answer, plaintiff by replication may meet it by an equitable reply, and where defendant pleaded a release of the cause of action sued on, plaintiff could by replication attack the settlement for fraud.

2. **Jury ⬅═31(3)—Statute permitting equitable reply to legal defense not invalid.**

Act March 3, 1915 (Judicial Code, § 274b [Comp. St. § 1251b]), construed as permitting plaintiff to meet a legal defense by an equitable reply, does not violate Const. Amend. 7, relative to jury trials, and is not invalid; there being no constitutional guaranty of permanent circuity of action.

3. **Equity ⬅═378—Submission of issues involved in equitable reply is discretionary, and preferable when issue simple.**

Under Act March 3, 1915 (Judicial Code, § 274b [Comp. St. § 1251b]), where defendant pleads a release, and plaintiff by replication alleges fraud and seeks equitable relief, whether the issues involved in the equitable relief should be submitted to a jury or determined by the court is a matter of judicial discretion, and where the issue is simple and eminently fit for submission, it should be left to the jury, as the statute is remedial, and should be liberally construed.

4. **Release ⬅═24(2)—May be set aside in equity without previous tender of consideration.**

Previous tender of the consideration of a release is not necessary in equity before setting it aside for fraud.

5. **Release ⬅═17(1)—Invalid when facts concealed.**

Where defendant agreed to pay plaintiff a specified portion of the profits on copper properties brought to his attention by plaintiff, defendant, in negotiating for a release of plaintiff's rights, could not legally conceal the facts known to him concerning the ore bodies in the properties, engineers' reports, advantageous methods of exploitation, and progress made in interesting powerful financial forces and experienced exploiters of such properties, and, where he did so, the settlement was invalid for fraud.

6. **Release ⬅═17(1)—Representation as to opinions and intentions concerning properties in which party releasing had interest held material.**

Where defendant agreed to pay plaintiff a share of the profits on copper properties brought to his attention by plaintiff, representations by him in negotiating for a release of plaintiff's rights as to his opinion of the properties and intentions concerning their acquisition, contemporaneously with the consummation of a deal highly satisfactory to him for the exploitation of the properties by powerful financial interests, were material and highly important.

7. **Judgment ⬅═713(3)—In suit to rescind assignment of option to purchase contract not conclusive in suit to set aside release made to holder of option.**

Defendant agreed to pay plaintiff a share of the profits on copper properties brought to his attention by plaintiff. Plaintiff gave R., defendant's agent, an option to purchase his contract for a comparatively small amount. Defendant demanded the option from R., and thereunder pro-

cured a release from plaintiff for the amount specified in the option. R. brought suit to rescind the assignment of the option for fraud, for the benefit of himself and plaintiff "as his interest may appear," having arranged with plaintiff to divide the proceeds. *Held*, that a judgment for defendant did not bar plaintiff's action to set aside his release for fraud and recover the profits due him, though both suits sought to make defendant liable on his original contract with plaintiff, as the suits were for different frauds, directed against different persons, with relation to different transactions. ·

8. **Limitation of actions** ⊙⟞104(1)—**Statute inapplicable when cause of action concealed by defendant.**

Though plaintiff's cause of action to set aside a release of his rights under a profit-sharing contract, and to recover the profits due him, accrued more than six years before suit was brought, the statute of limitations was not a defense, where the cause of action had been fraudulently concealed by defendant.

9. **Release** ⊙⟞24(1)—**Delay in repudiating not laches, when no disadvantage resulted.**

Where plaintiff's delay in suing to set aside a release of his rights under a profit-sharing contract and to recover the profits due him did not operate in any way to defendant's disadvantage, laches was not available as a defense, as such defense depends on the circumstances of the particular case.

10. **Release** ⊙⟞22—**Plaintiff's attempt to recover profits released through third person's suit held to give defendant no right to complain.**

Where defendant, agreeing to pay plaintiff a share in the profits on certain copper properties, obtained a release from plaintiff by concealing facts plaintiff was entitled to know, he could not complain because plaintiff, before obtaining full knowledge, arranged with a third person to share the proceeds of a suit brought by him seeking to recover the same profits under an option given by plaintiff to the third person and assigned to defendant.

In Error to the District Court of the United States for the District of Massachusetts; James M. Morton, Jr., Judge. ·

Action by Arthur S. Plews against Albert C. Burrage. Judgment for defendant on demurrer (271 Fed. 727), and plaintiff brings error. Reversed and remanded.

See, also, 260 Fed. 1018; 266 Fed. 347.

Sherman L. Whipple and Alexander Lincoln, both of Boston, Mass., for plaintiff in error.

Boyd B. Jones and Philip N. Jones, both of Boston, Mass., for defendant in error.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

ANDERSON, J. Plews brings this suit at law on a written contract under which Burrage agreed to pay Plews 5 per cent. of all profits in stock or money accruing to Burrage out of his acquisition of copper properties brought to his attention by Plews. On a record made up of a declaration, answer, replication, and demurrer to the replication, the District Court was of the opinion that the crucial questions were close and doubtful, and therefore sustained the demurrer and entered judgment for the defendant. Although this unusual array of plead-

ings covers about 80 pages, and has been argued by learned counsel at great length, yet, stripped of confusing details and irrelevant issues, the case falls within narrow compass. There is no dispute as to the making, or the terms, or the application of the contract to properties out of the acquisition of which Burrage derived large profits either in January, 1912, or January, 1913. This makes a prima facie case for the plaintiff. But defendant alleges and plaintiff admits that, shortly before February 28, 1912, Burrage personally and through his agent, Ross, paid Plews £500 for a settlement or informal release of Plews' profit-sharing rights under this contract. If valid, this settlement is a good defense. In his replication the plaintiff attacks this settlement as vitiated by Burrage's fraud, and offers to repay the £500. By his demurrer to the replication defendant urges:

(1) That as matter of procedure the action cannot be maintained, until by separate proceedings in equity the settlement is set aside.

(2) That the contract created no fiduciary relation, and that therefore Burrage's alleged failure, when settling with Plews, to disclose facts known to him and unknown to Plews, and material to the ascertainment by Plews of the value of his rights under the contract, was no fraud.

(3) That the affirmative oral and written misrepresentations alleged to have been made by Burrage to Plews involved merely matters of opinion, and not actionable fraud.

We think the replication on these points good, and the demurrer bad.

1. The case is as to procedure closely analogous to Manchester Street Railway v. Barrett, 265 Fed. 557, 559, in which this court recently sustained the District Court of the New Hampshire district in submitting to the jury in a personal injury case the question as to whether the release set up as a bar was voidable for fraud or the incompetency of the deceased victim of the accident. It cannot be successfully contended that such procedure is peculiar to the New Hampshire district, for G. L. Mass. c. 231, § 35, expressly provides for like procedure in this district. It reads:

"The plaintiff may, in reply to a defense alleged by the defendant, allege any facts which would in equity avoid such defense or which would entitle the plaintiff to be absolutely and unconditionally relieved in equity against such defense."

[1] But, apart from state statutes and local procedure, we are constrained to regard the Act of March 3, 1915 (Judicial Code, § 274b [Comp. St. § 1251b]), as requiring us to approve the procedure here adopted by the plaintiff. That section reads as follows:

"That in all actions at law equitable defenses may be interposed by answer, plea, or replication without the necessity of filing a bill on the equity side of the court. The defendant shall have the same rights in such case as if he had filed a bill embodying the defense of seeking the relief prayed for in such answer or plea. Equitable relief respecting the subject-matter of the suit may thus be obtained by answer or plea. In case affirmative relief is prayed in such answer or plea, the plaintiff shall file a replication. Review of the judgment or decree entered in such case shall be regulated by rule of court. Whether such review be sought by writ of error or by appeal the appellate court shall have full power to render such judgment upon the records as law and justice shall require."

We think the words, "In all actions at law equitable defenses may be interposed by * * * replication, without the necessity of filing a bill on the equity side of the court," mean that when, as in the present case, a legal defense is set up in the answer, the plaintiff has by replication the same right to meet such legal defense by equitable reply as a defendant has to set up in his answer an equitable defense to a legal claim set up in the declaration. We cannot believe that Congress intended to prevent circuity of action when a defendant, sued at law, has an equitable defense, and did not intend to prevent circuity of action when a plaintiff needs to interpose a reply grounded on equity in order to meet a legal defense set up in the answer. We are aware that a majority of the Court of Appeals of the Second Circuit reached a different conclusion in Keatley v. U. S. Trust Co., 249 Fed. 296, 161 C. C. A. 304; but our views as to the scope and meaning of this statute accord with those of Judge Learned Hand, who, dissenting, said:

"It seems to me that we should not construe so narrowly section 274b. The phrase, 'equitable defenses may be interposed by * * * replication without the necessity of filing a bill on the equity side of the court,' can only mean, I think, this: That where the defendant interposes a bar valid at law, the plaintiff may set up in his next pleading facts avoiding the bar in equity. The suggestion is that it might give the plaintiff the right to plead to the defendant's 'equitable defenses' set up in the answer, but that is independently provided for in the fourth sentence of the act. Besides, the defendant's answer to a suit in equity cannot properly be said to be interposed by 'filing a bill on the equity side of the court,' which is the language of the first sentence.

"So far as we may look to the purpose of the section I cannot think there is any doubt. Congress can hardly be thought to have any predilection for plaintiffs' suits in equity rather than defendants', and we must leave a capricious exception in practice, if we do not include a case like this. I agree that the language of the section is not what a Mitford or a Langdell would have used; but the purpose seems to me perfectly plain, and we ought, I think, to try to effect it if we can."

See, also, the Knickerbocker Trust Case, 247 Fed. 833, 837, 160 C. C. A. 55.

[2] Defendant's contention that, so construed, the statute is unconstitutional, is plainly untenable. The decision in Scott v. Neely, 140 U. S. 106, 11 Sup. Ct. 712, 35 L. Ed. 358, so far as now pertinent, is merely to the effect that legal and equitable remedies cannot be so blended in equity suits as to impair the constitutional right to jury trial given by the Seventh Amendment. Stockbridge v. Mixer, 215 Mass. 415, 102 N. E. 646, is to the same effect. Compare State v. Saunders, 66 N. H. 39, 76, et seq., 25 Atl. 588, 18 L. R. A. 646. There is no constitutional guaranty of permanent circuity of action.

[3] Whether issues of fact involved in such equitable relief should be submitted to a jury or determined by the court is, in our opinion, a question of judicial discretion. We are not able to accord with the view that the issue calling for equitable relief must first be tried by the court alone, sitting as a court of equity. Compare Union Pacific R. R. v. Syas, 246 Fed. 561, 158 C. C. A. 531. While the verdict of a jury may in the equitable issue be advisory only, yet when such issue is, as in this case, simple and one eminently fit for submis-

sion to a jury, we think the practice adopted in the Barrett and Knickerbocker Trust Cases, supra, is the preferable practice, and the one most consonant with the spirit and purpose of the statute. The statute is remedial, and should be liberally construed in favor of a single, direct, and speedy trial of all issues involved in the litigation.

We find it difficult to appreciate the importance apparently attached by learned counsel to mere form of procedure in this case; for, even if we were required to sustain the defendant's contention against combining equitable relief in a law suit, the most that could result would be an order made under the provisions of Judicial Code, § 274a (Comp. St. § 1251a), to amend the present law suit into a bill in equity. It seems to us too plain for argument that, assuming such amendment, the plaintiff, on the allegations in these pleadings, would be entitled to a trial of the issue of fraud concerning his settlement with Burrage, and prevailing on such issue, to an account under the contract. Compare Reid v. Shaffer, 249 Fed. 553, 161 C. C. A. 479, and cases cited.

Shortly stated, Burrage's position is not unlike that of an administrator who, falsely understating the amount of his decedent's estate, has obtained from an heir a receipt in full for his distributive share. It would hardly be contended that such receipt could be successfully interposed as a bar to a suit, at law or in equity, for the balance justly due.

[4] Our views as to proper procedure make it unnecessary to discuss the learned argument of counsel for defendant as to technical rescission in pure law suits. It has no application to the real case before us. Previous tender of the consideration of the settlement is, of course, not necessary in equity. Thomas v. Beals, 154 Mass. 51, 27 N. E. 1004; Twin Lakes, etc., Co. v. Dohner, 242 Fed. 399, 155 C. C. A. 175.

[5] 2. We cannot sustain the defendant's proposition that Burrage, when trading with Plews as to his rights as a co-profit-sharer, was under no duty of disclosure. A right to profits without a right to knowledge of their accrual is a contradiction in terms; the former, without the latter, is or may be worthless. A right to receive profits connotes a right to enforce payments; ignorance of their accrual may destroy both rights. Plews, in London, was entitled to 5 per cent. of profits, if they should accrue to Burrage, then in the United States, out of properties being exploited by Burrage and the Guggenheims in South America. The defendant's contention that he was under no obligation to disclose to Plews material facts as to the opinions of mining experts concerning these properties, the status of his negotiations for their acquisition, and the other salient facts as to the interest shown by powerful financial forces, like the Guggenheims, in the prospective purchase and development thereof, amounts to the proposition that, although Plews was admittedly entitled to 5 per cent. of profits thus made by Burrage, he must discover the accrual of such profits at his peril, and bring suit therefor before the running of the statute of limitations, or be forever barred. This theory makes a profit-sharing contract a trap—a means of legalized moral fraud; secret profits thus become legally acquired profits.

See Guggenheim v. Guggenheim, 95 Misc. Rep. 332, 159 N. Y. Supp. 333, and cases cited on page 342; Selwyn v. Waller, 212 N. Y. 507, 106 N. E. 321, L. R. A. 1915B, 160; Brooks v. Martin, 2 Wall. 70, 17 L. Ed. 732; Butler v. Prentiss, 158 N. Y. 49, 52 N. E. 652; Kimberly v. Arms, 129 U. S. 512, 9 Sup. Ct. 355, 32 L. Ed. 764; Jackson v. Hooper, 76 N. J. Eq. 185, 74 Atl. 130; Knapp v. Hanley, 108 Mo. App. 353, 83 S. W. 1005.

As stated by the court in Selwyn v. Waller:

"The rule against secret profits is not limited in its application to cases of agency, trusteeship, and the like strictly fiduciary relations. Its application to a case like this depends on the reciprocal good faith required of joint adventurers, and more precisely upon the mutual burdens and benefits which the relation necessarily implies are to be shared in the stipulated proportions."

There obviously could be no equality in trading positions between Burrage and Plews, if Burrage could legally conceal from Plews what he had learned as to the ore bodies in the properties, as to the engineers' reports, as to advantageous methods of exploitation, as to progress made in interesting powerful financial forces and experienced exploiters of such properties; Plews was at Burrage's mercy. See, also, Valdes v. Larrinaga, 233 U. S. 705, 709, 34 Sup. Ct. 750, 58 L. Ed. 1163; American Circular Loom Co. v. Wilson, 198 Mass. 182, 206, 84 N. E. 133, 126 Am. St. Rep. 409, and cases cited; Barnes v. Alexander, 232 U. S. 121, 34 Sup. Ct. 276, 58 L. Ed. 530; Hawkes v. Lackey, 207 Mass. 424, 432, 433, 93 N. E. 828; Bower on Actionable Nondisclosure, §§ 1, 3, 315; Hill v. Hall, 191 Mass. 253, 262, 263, 77 N. E. 831; Tate v. Williamson, L. R. 2 Ch. App. 55, 61; Reid v. Shaffer, 249 Fed. 553, 560, 561, 161 C. C. A. 479. See, also, the excellent statement of the principles underlying this duty of disclosure by Sanborn, J., in Trice v. Comstock, 121 Fed. 620, 622, 623, 57 C. C. A. 646, 61 L. R. A. 176.

We hold that if, as is alleged and by the demurrer admitted, Burrage procured a settlement with Plews as to his profit-sharing rights, concealing by silence from Plews facts material to enable Plews to judge of the value of those rights, such settlement is invalid for fraud.

[6] 3. As to the affirmative oral and written misrepresentations, we hold the allegations in the replication good and the demurrer bad.

Under the circumstances, Burrage's representations as to his opinion of the properties and intentions as to their acquisition were material and highly important. Some of the written representations are found in letters written by Burrage from Boston in January, 1912, contemporaneously with the consummation of a deal highly satisfactory to Burrage between him and the Guggenheims for the formation of the Chile Exploration Company, which, from advances made by the Guggenheims, was to repay to Burrage $40,819.73 previous expenses incurred by him, and bear the further expense of experimental investigation (which in fact aggregated about $175,000), one-half of the stock representing the expected profits of the undertaking to be Burrage's until the properties should be purchased and turned over to

another company, with such ultimate division of the stock as made Burrage's alleged profits some $20,000,000. The concealment of these facts, coupled with the affirmative representations made in these letters, was exactly calculated to induce Plews to do what he did do—settle with Burrage for his 5 per cent. of profits for the comparatively trifling sum of £500, about one-fourth of 1 per cent. of the alleged value of his interest. Compare Commonwealth v. Althause, 207 Mass. 32, 47, 48, 93 N. E. 202, 31 L. R. A. (N. S.) 999; Comstock v. Livingston, 210 Mass. 581, 583, 97 N. E. 106.

The rules as to opinions—ordinary trade talk—in dealings between would-be vendor and prospective purchaser, are not applicable to this transaction. Compare Lehigh Zinc & T. Co. v. Bamford, 159 U. S. 665, 673, 14 Sup. Ct. 219, 37 L. Ed. 1215.

[7] 4. The next defense pleaded is that Plews is barred by a final decree in Burrage's favor in what is described as the Ross-Plews suit, brought in the Supreme Judicial Court of Massachusetts, in May, 1913, and ended by final decree on December 3, 1918. The present suit was brought on July 25, 1918. This plea cannot be sustained. It is plain that the two suits are for different causes of action. The material facts as to the Ross-Plews suit are as follows: In September, 1911, Plews gave Ross, who was Burrage's agent and employee in Burrage's business of discovering and acquiring copper properties, an option to buy Plews' contract with Burrage for £500, if paid on or before February 28, 1912. This option was, on Burrage's demand, turned over by Ross to Burrage and taken up by him as above noted. Ross, in addition to a salary, also had a profit-sharing contract with Burrage, which Ross was induced to agree to release to Burrage on payment, at Burrage's option, of $100,000.

In 1913 Ross brought in the Massachusetts court two suits against Burrage, one to avoid his agreement as to his own profit-sharing contract (reported in 233 Mass. 439; 124 N. E. 267), and the other to rescind his assignment to Burrage of the option which he had obtained on Plews' contract and turned over to Burrage his principal. The second (or Ross-Plews) suit was entitled as brought for the benefit of himself and Plews, "as his interest may appear." Prior to bringing this suit Ross and Plews made an arrangement, contingent upon success in that suit, that one-third of the proceeds thereof should be paid over to Plews, two-thirds being retained by Ross, who was to pay all the expenses of litigation. This agreement is irrelevant. Ross never owned Plews' contract with Burrage. For present purposes, the option on it ran to Burrage, not to Ross. The crux of that case was Ross' contention that Burrage had obtained the assignment of Ross'. option on Plews' profit-sharing contract by fraud upon him, Ross. The master, by final report filed on June 13, 1918, found Burrage guilty of no fraud on Ross in acquiring this option. This finding ended that case, and the contingent arrangements between Ross and Plews fell with it.

In that case no contention was made that Burrage had been guilty of fraud upon Plews, either personally or through misrepresentations or concealments of his agent Ross. But the crux of the instant case

is an alleged fraud by Burrage upon Plews in acquiring from Plews —not from Ross—a settlement for £500 of Plews' rights under this profit-sharing contract. The fact that the result sought in both cases is to make Burrage liable on his original contract, has no tendency to show that the two suits are for the same cause of action. It is, to repeat, clear that the suits are for different frauds, directed against different persons, with relation to different transactions. See Foye v. Patch, 132 Mass. 105; Harlow v. Bartlett, 170 Mass. 584, 49 N. E. 1014.

[8] 5. The defendant's plea of the statute of limitations is bad. The declaration alleges that the cause of action accrued on January 25, 1912, more than six years before this suit was brought, when the defendant became entitled as profits to 5,000 shares of the stock of the Chile Exploration Company; it also sets up fraudulent concealment, with ample specifications. But in oral argument the defendant's counsel asserts that Burrage's profits accrued not in January, 1912, but in January, 1913, when the properties were secured and turned over to the Chile Copper Company, at a cost of over $1,000,000. On either theory, therefore, the statute is not applicable.

[9, 10] 6. Although the defendant in the seventh paragraph of his demurrer pleads estoppel by laches, he has not argued it in his brief, and we infer does not now rely upon it. But, if wrong in this inference, it is clear that the defense cannot be maintained. Even if we assume that it is open in this case, as it may be if this case be regarded as technically in equity (see Wehrman v. Conklin, 155 U. S. 314, 329, 15 Sup. Ct. 129, 39 L. Ed. 167), there is nothing to indicate that Plews' delay in bringing this suit has operated in any way to the disadvantage of Burrage, or that Burrage, denying any obligation to disclose the material facts to his co-profit-sharer, is in any position to urge as a bar any delay by Plews short of the full period of the statute of limitations.

The doctrine of laches depends on the circumstances of the particular case. See O'Brien v. Wheelock, 184 U. S. 450, 493, 22 Sup. Ct. 354, 46 L. Ed. 636; No. Pacific R. R. Co. v. Boyd, 228 U. S. 482, 509, 33 Sup. Ct. 554, 57 L. Ed. 931. And it appears that Plews never discovered the full facts necessary to form a judgment as to his rights until the trial before the master of the two suits brought by Ross, on some date not definitely stated but presumably not long before the filing of the master's draft report on November 27, 1917. Burrage, concealing facts Plews was entitled to know, has no legal cause of complaint because Plews, before obtaining the full knowledge to which he was entitled, arranged with Ross to share the proceeds of the Ross-Plews suit if it should be successful. Promptly after decision in that suit by the master, and without waiting for the master's report to be confirmed by the court, the present suit was instituted.

The result is that the parties are at issue: (1) As to the validity of the settlement pleaded in bar of Plews' rights under the contract; (2) as to the fraudulent concealment of the accrual of the cause of action, if the plaintiff relies on the date he alleges, January, 1912, in-

stead of the date admitted by defendant, January, 1913; (3) as to the amount of damages or profits.

The judgment of the District Court is reversed, with costs to plaintiff in error, and the case is remanded to that court for further proceedings not inconsistent with this opinion.

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes